**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | |
|---|---|
| KEVAN SEIDNER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARIETIS HEALTH, LLC,<br><br>Defendant. | Case No.____________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

Plaintiff Kevan Seidner ("Plaintiff") brings this Class Action Complaint on behalf of himself, and all others similarly situated, against Defendant Arietis Health, LLC ("Arietis" or "Defendant"), alleging as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to him, which are based on personal knowledge:

## NATURE OF THE ACTION

1. Healthcare providers and their business associates who handle sensitive, personally identifying information ("PII") or protected health information ("PHI") owe a duty to the individuals to whom that data relates. This duty arises because it is foreseeable that the exposure of PII or PHI to unauthorized persons—

and especially hackers with nefarious intentions—will result in harm to the affected individuals, including, but not limited to, the invasion of their private health matters.

2. The harm resulting from a data and privacy breach manifests in a number of ways, including identity theft and financial fraud, and the exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk—to the extent it is even possible to do so—requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take a number of additional prophylactic measures.

3. Arietis is a Florida-based technology company that provides data analytics, automation, and business intelligence services to healthcare providers ("Customer- Healthcare Providers") so that those providers can optimize their revenue cycles.[1] Defendant's website states that it codes 1.8 million charts annually and improves its Customer-Healthcare Providers' collections by 15%.[2] As part of its business operations, Defendant uses a managed file transfer software call MOVEit.

---

[1] *We demystify healthcare billing by empowering people*, ARIETIS HEALTH, https://www.arietishealth.com/ (last visited Oct. 16, 2023).
[2] *Id.*

4. MOVEit software is likewise used by a large number of commercial entities and federal and state agencies to transfer large data files.

5. As a healthcare business associate of its Customer-Care Providers, Arietis knowingly obtains sensitive patient PII and PHI and has a resulting duty to securely maintain such information in confidence.

6. Arietis expressly recognizes this duty indicating that it "take[s] extreme measures to provide [its customers] with the highest quality compliance, data security and revenue integrity plan" and further indicates that it has "100% compliance with Annual HIPPA [sic] training." .[3]

7. Despite Arietis's duty to safeguard the PII and PHI of the patients of its Customer-Healthcare Providers, Plaintiff's and Class Members' sensitive information was exposed unauthorized third parties during massive data breach that occurred on or about May 27, 2023 (the "Data Breach"). The Data Breach exploited a vulnerability in the MOVEit technology, which Defendant uses in its regular course of business.

8. The United States Cybersecurity & Infrastructure Security Agency has identified the data exfiltrators as "CL0P Ransomware Gang," also known as TA505, and reports that the attacks were conducted by exploiting a vulnerability catalogued

[3] *Revenue Cycle Management, Reimagined*, ARIETIS HEALTH, https://www.arietishealth.com/company/about/ (last visited Oct. 16, 2023).

as "CVE-2023-34362" in order to exfiltrate data from the underlying MOVEit databases.[4] CISA reports that TA505 has been known both to publish exfiltrated data and to ransom exfiltrated data for profit.

9. Despite becoming aware of the Data Breach on May 31, 2023, Arietis waited nearly five months to notify individuals impacted by the Data Breach. Indeed, Defendant waited until on or about September 29, 2023, to begin notifying individuals that their PII and PHI had been compromised during the Data Breach.[5]

10. Based on the public statements of Arietis to date, a wide variety of PII and PHI was implicated in the Data Breach, including but not limited to individuals' names, dates of birth, driver's license or other state identification card numbers, addresses, Social Security numbers, medical record numbers, patient account numbers, health insurance information, diagnosis and treatment information, clinical and prescription information, and/or provider information.[6]

11. As a direct and proximate result of Defendant's failure to implement and follow basic security procedures, Plaintiff's and Class Members' PII and PHI is now in the hands of cybercriminals.

---

[4] *#StopRansomeware: CL0P Ransomware Gang Exploits CVE-2023-34362 MOVEit* V*ulnerability*, Cybersecurity & Infrastructure Security Agency (June 7, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a.

[5] *See Cases Currently Under Investigation*, U.S. DEPT. OF HEALTH AND HUMAN SERVICES OFFICE OF CIVIL RIGHTS, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last accessed October 16, 2023).

[6] *Notice of Security Incident*, ARIETIS HEALTH, https://www.arietishealth.com/notice-of-security-incident/ (last visited Oct. 20, 2023).

12. Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy and similar forms of criminal mischief, risk which may last for the rest of their lives. Consequently, Plaintiff and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

13. Plaintiff, on behalf of himself, and all others similarly situated, alleges claims for negligence, negligence *per se*, and declaratory judgment. Plaintiff seeks damages and injunctive relief, including the adoption of reasonably sufficient practices to safeguard PII and PHI in Defendant's custody in order to prevent incidents like the Data Breach from reoccurring in the future.

## PARTIES

14. Plaintiff Seidner is an adult who, at all relevant times, is a resident and a citizen of the Commonwealth of Pennsylvania. Plaintiff was a patient of one of Arietis's Customer-Healthcare Providers. Plaintiff received a Data Breach Notification from Defendant informing him that his PII and PHI in Defendant's possession had been exposed during the Data Breach.

15. Defendant Arietis Health, LLC is a Delaware limited liability company with a principal place of business in Fort Meyers, Florida. Upon information and belief, Defendant has two LLC members—Ashwini Kotwal and Eric Minkove.

16. Ashwini Kotwal is an adult who, at all relevant times, is a resident and citizen of the State of North Carolina.

17. Eric Minkove is an adult who, at all relevant times, is a resident and citizen of the District of Columbia.

18. Arietis is a citizen of each state in which one of its members is a citizen. As such, Arietis is a citizen of the District of Columbia and North Carolina.

19. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged here are currently unknown to Plaintiff.

20. Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of such responsible parties when their identities become known.

## JURISDICTION AND VENUE

21. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

22. This Court has personal jurisdiction over Defendant because Arietis has its principal place of business in this District, and at all relevant times, Defendant has engaged in substantial business activities in Florida.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2), because this is where Defendant resides, and a substantial part of the acts, omissions, and events giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

### A. Arietis and the Services it Provides.

24. Arietis is a "patient-centric and tech-powered" organization whose goal is to "optimize revenue, improve security, ensure compliance, and enhance business excellence" for its Customer-Healthcare Providers.[7]

25. Upon information and belief, while administering billing services to its Customer-Healthcare Providers, Arietis receives, maintains, and handles patient PII and PHI, which includes, *inter alia*, names, dates of birth, driver's license or other state identification card numbers, addresses, Social Security numbers, medical record numbers, patient account numbers, health insurance information, diagnosis and treatment information, clinical and prescription information, and/or provider information.

[7] *We demystify healthcare billing by empowering people*, *supra* note 1.

26. Upon information and belief, because Arietis receives, maintains, and handles PII and PHI from its Customer-Healthcare Providers, Defendant qualifies as a business associate within the meaning of 45 C.F.R. § 160.103(3) and has therefore entered into Business Associate Agreements with its Customer-Healthcare Providers, becoming a custodian of patient PHI.

27. As a business associate of its Customer-Healthcare Providers, Arietis is a covered entity under the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1302d, *et seq*.

28. Plaintiff and Class Members directly or indirectly entrusted Arietis with their sensitive and confidential PII and PHI and therefore reasonably expected that Defendant would safeguard their highly sensitive information and keep their PHI confidential.

29. As a custodian of Plaintiff's and Class Members' PII and PHI, Arietis assumed equitable and legal duties to safeguard and keep confidential Plaintiff's and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

30. Despite these duties and indicating that "the privacy and protection of the information it maintains is a top priority,"[8] Arietis nevertheless employed inadequate data security measures to protect and secure the PII and PHI entrusted to

---

[8] *Notice of Security Incident*, *supra* note 6.

it, resulting in the Data Breach and compromise of Plaintiff's and Class Members' PII and PHI.

**B. Arietis Knew the Risks of Storing Valuable PII and PHI and the Foreseeable Harm to Victims.**

31. Arietis was well aware that the PII and PHI it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

32. Arietis also knew that a breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose PII and PHI was compromised, as well as intrusion into their highly private health information.

33. These risks are not theoretical; in recent years, numerous high-profile breaches have occurred at businesses such as Equifax, Facebook, Yahoo, Marriott, Anthem, and many others.

34. PII has considerable value and constitutes an enticing and well-known target to hackers. Hackers can easily sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[9] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false claims for reimbursement.

---

[9] Brian Krebs, *The Value of a Hacked Company*, KREBS ON SEC. (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

35. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. In 2021, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[10]

36. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[11]

37. The healthcare industry has become a prime target for threat actors: "[h]igh demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[12]

38. Additionally, "[h]ospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it quickly—making the industry a growing target."[13]

---

[10] *Data Breach Report: 2021 Year End*, RISK BASED SEC. (Feb. 4, 2022), https://www.riskbasedsecurity.com/2022/02/04/data-breach-report-2021-year-end/.

[11] *Facts + Statistics: Identity theft and cybercrime*, INS. INFO. INST., https://www.iii.org/factstatistic/facts-statistics-identity-theft-andcybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited Oct. 20, 2023).

[12] *The healthcare industry is at risk*, SWIVELSECURE, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Oct. 20, 2023).

[13] *Id.*

39. Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2022, 5,150 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights, resulting in the exposure or unauthorized disclosure if the information of 382,262,109 individuals—"[t]hat equates to more than 1.2x the population of the United States."[14]

40. Further, the rate of healthcare data breaches has been on the rise in recent years. "In 2018, healthcare data breaches of 500 or more records were being reported at a rate of around 1 per day. Fast forward 5 years and the rate has more than doubled. In 2022, an average of 1.94 healthcare data breaches of 500 or more records were reported each day."[15]

41. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[16]

42. The healthcare sector suffered about 337 breaches in the first half of 2022 alone, according to Fortified Health Security's mid-year report released in July

---

[14] *Healthcare Data Breach Statistics*, HIPAA J., https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited Oct. 18, 2023).
[15] *Id.*
[16] *2022 Breach Barometer*, PROTENUS, https://www.protenus.com/breach-barometer-report, (last visited Oct. 20, 2023).

2022. The percentage of healthcare breaches attributed to malicious activity rose more than five percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[17]

43. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves the patients of Arietis' healthcare provider partners especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

44. **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach— unique social security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

45. The Social Security Administration even warns that the process of replacing a Social Security is a difficult one that creates other types of problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental

[17] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, CYBERSECURITY NEWS (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

> agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.[18]

46. Social security numbers allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit – among other services. Often social security numbers can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes social security numbers a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

47. **Healthcare Records**—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals – they can access a patient's name, DOB, Social Security and insurance

---

[18] *Identify Theft and Your Social Security Numbers*, SOCIAL SEC. ADMIN. (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf, (last visited Oct. 20, 2023).

numbers, and even financial information all in one place. 'Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to – we've even seen $60 or $70.'"[19] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[20]

48. Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[21]

49. "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder

---

[19] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat, (last visited Oct. 20, 2023).

[20] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security® Survey 2015*, PRICEWATERHOUSECOOPERS (Sept. 30, 2014), https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited Oct. 20, 2023).

[21] Steve Adler, *Editorial: Why Do Criminals Target Medical Records*, HIPAA Journal. (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records/#:~:text=Healthcare%20records%20are%20so%20valuable,credit%20cards%20in%20victims'%20names.

to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts – far more than is usually possible with stolen credit card information."[22]

50. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[23]

[22] *Id.*
[23] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, EXPERIAN (Mar. 31, 2023), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

51. **Driver's License Numbers**—are highly sought after by cyber criminals on the dark web because they are unique to a specific individual and extremely sensitive. This is because a driver's license number is connected to an individual's vehicle registration, insurance policies, records on file with the DMV, places of employment, doctor's offices, government agencies, and other entities.

52. For these reasons, driver's license numbers are highly sought out by cyber criminals because they are one of the most valuable pieces of information to facilitate identity theft and fraud. This information is valuable because cyber criminals can use this information to open credit card accounts, obtain insurance policies and submit fraudulent claims, open cell phone contracts, file fraudulent tax returns, file unemployment applications, as well as obtain bank loans under a person's name.

53. Further, unlike credit or debit card numbers in a payment card data breach, which can quickly be frozen and reissued in the aftermath of a breach, the type of PII at stake here—unique driver's license numbers—cannot be easily replaced.

54. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the [Dark] Web, fraudulent use of that

information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[24]

55. Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

56. Based on the value of patients' PII and PHI to cybercriminals, Arietis knew or should have known, the importance of safeguarding the PII and PHI entrusted to it and of the foreseeable consequences if its data security systems were breached. Arietis failed, however, to take adequate cyber security measures to prevent the Data Breach from occurring.

[24] U.S. Gov't Accountability Off., GAO-07-737, Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown (2007), https://www.gao.gov/new.items/d07737.pdf (last visited Oct. 20, 2023).

**C. Arietis Breached its Duty to Protect Individuals' PII and PHI.**

57. Arietis engaged Progress Software Corporation to provide it with secure file transfer services—MOVEit. Upon information and belief, Arietis uses MOVEit , a secure file transfer software, to exchange files with its Customer-Healthcare Providers. By using on-premises MOVEit hardware, Defendant had physical control over the server that was compromised at the time of the Data Breach.

58. Beginning on or around May 27, 2023, the notorious CL0P ransomware gang exploited a vulnerability in the MOVEit software and accessed, copied, and stole Plaintiff's and Class Members' PII and PHI.[25] The vulnerability allowed CL0P to escalate suer privileges and gain unauthorized access to customer environments.[26] Following the discovery of the initial vulnerability in the file transfer software, give additional vulnerabilities were subsequently discovered.[27]

59. However, investigations following CL0P's exploitation of the MOVEit vulnerability have subsequently revealed that CL0P had known about this particular vulnerability and had been experimenting with ways to exploit as far back as 2021.[28]

---

[25] *#StopRansomeware: CL0P Ransomware Gang Exploits CVE-2023-34362 MOVEit* V*ulnerability*, *supra* note 4.
[26] Matt Kapko, *MOVEit Mass Exploit Timeline: How the File-Transfer Services Attacks Entangled Victims*, CYBERSECURITY DIVE (Sept. 25, 2023), https://www.cybersecuritydive.com/news/moveit-breach-timeline/687417/.
[27] *Id.*
[28] Laurie Iacono et al., *Clop Ransomware Likely Sitting on MOVEit Transfer Vulnerability (CVE-2023-34362) Since 2021*, KROLL (June 8, 2023),

60. Indeed, one security firm's review of "logs of impacted [MOVEit] clients found evidence of similar [malicious] activity occurring in multiple client environments last year (April 2022) and in some cases as early as July 2021."[29]

61. The security firm "also discovered the threat actors were testing ways to collect and extract sensitive data from compromised MOVEit Transfer servers as far back as April 2022, likely with the help of automated tools."[30]

62. As such, the 2022 activity and "[t]he malicious activity appeared to be aimed at exfiltrating Organization IDs ("Org IDs") which identified specific MOVEit Transfer users and would have helped Clop determine which organizations it could access."[31]

63. According to Defendant, on May 31, 2023, Arietis was alerted to the vulnerability by Progress Software which affected Arietis's MOVEit server.[32]

64. Following that notification, Arietis engaged cybersecurity experts to conduct an investigation. The investigation determined that unauthorized actors had gained access to its MOVEit server and may have acquired files containing the

---

https://www.kroll.com/en/insights/publications/cyber/clop-ransomware-moveit-transfer-vulnerability-cve-2023-34362.

[29] Sergiu Gatlan, *Clop Ransomware Likely Testing MOVEit Zero-Day Since 2021*, BLEEPING COMPUTER (June 8, 2023), https://www.bleepingcomputer.com/news/security/clop-ransomware-likely-testing-moveit-zero-day-since-2021/.

[30] *Id.*

[31] Simon Hendery, *Ransomware Gang Clop Prepped Zero-Day MOVEit Attacks in 2021*, SC MAGAZINE (June 9, 2023), https://www.scmagazine.com/news/ransomware-gang-clop-zero-day-moveit-2021.

[32] *Notice of Security Event*, *supra* note 6.

information of the patients of Arietis's healthcare provider partners.[33] More specifically, Arietis determined that CL0P may have acquired the data of patients of 54 different entities.[34]

65. Based on Arietis's statements, the information accessed during the Data Breach includes, *inter alia*, patient names, dates of birth, driver's license or other state identification card numbers, addresses, Social Security numbers, medical record numbers, patient account numbers, health insurance information, diagnosis and treatment information, clinical and prescription information, and/or provider information.[35]

66. On or about October 2, 2023, Arietis reported the Data Breach to the Department of Health and Human Services ("HHS"), indicating that the sensitive information of approximately 1.9 million people had been compromised in the Data Breach.[36]

67. Despite learning about the vulnerability in the MOVEit software on May 31, 2023, Arietis did not begin notifying impacted individuals until on or about September 29, 2023—nearly five months after the Data Breach occurred. Indeed,

[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Cases Currently Under Investigation*, *supra* note 5.

Plaintiff did not receive a data breach notice informing him that his PII and PHI had been compromised during the Data Breach until on or about September 29, 2023.

68. Upon information and belief, Class Members received similar Data Breach notices on or around the same time, informing them that their PII and/or PHI was exposed during the Data Breach.

69. The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic data security procedures in order to protect individuals' PII and PHI. Arietis could have prevented the Data Breach, or substantially mitigated its severity, if it had properly screened its vendors or contractors, such as Progress Software, for cybersecurity standards as well as conducting cybersecurity audits of its contractors and vendors.

**D. Arietis is Obligated Under HIPAA to Safeguard Patient PHI.**

70. As a business associate of its Customer-Healthcare Providers, Arietis is required by HIPAA to safeguard patient PHI.

71. Arietis is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

72. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

73. Under 45 C.F.R. § 160.103, HIPAA defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media;" "[m]aintained in electronic media;" or "[t]ransmitted or maintained in any other form or medium."

74. Under 45 C.F.R. § 160.103, HIPAA defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2)"[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) "identifies the individual;" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual."

75. HIPAA requires Arietis to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. §§ 164.102, *et seq*.

76. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Arietis to provide notice of the Data Breach to each affected individual

"without unreasonable delay and in no case later than 60 days following discovery of the breach."[37]

77. HHS further recommends the following data security measures a business associate such as Arietis should implement to protect against some of the more common, and often successful, cyber-attack techniques. According to those guidelines, business associates should:

a. Implement security awareness and training for all workforce members and that the training programs should be ongoing, and evolving to be flexible to educate the workforce on new and current cybersecurity treats and how to respond;

b. Implement technologies that examine and verify that received emails do not originate from known malicious site, scan web links or attachments included in emails for potential threats, and impeded or deny the introduction of malware that may attempt to access PHI;

c. Mitigate known data security vulnerabilities by patching or upgrading vulnerable technology infrastructure, by upgrading or replacing obsolete and/or unsupported applications and devices,

[37] *Breach Notification Rule*, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html.

or by implementing safeguards to mitigate known vulnerabilities until an upgrade or replacement can occur;

d. Implement security management processes to prevent, detect, contain, and correct security violations, including conducting risk assessments to identify potential risks and vulnerabilities to the confidentiality, integrity, and availability of PHI; and

e. Implement strong cyber security practices by requiring strong passwords rules and multifactor identification.[38]

78. Upon information and belief, Defendant failed to implement one or more of the recommended data security measures and timely notify Plaintiff and Class Members of a data breach impacting their PHI.

79. While HIPAA permits healthcare providers and their business associates to disclose PHI to third parties under certain circumstances, HIPAA does not permit healthcare providers and their business associates to disclose PHI to cybercriminals nor did Plaintiff or the Class Members consent to the disclosure of their PHI to cybercriminals.

80. As such, Arietis is required under HIPAA to maintain the strictest confidentiality of Plaintiff's and Class Members' PHI that it acquires, receives, and

[38] *OCR Quarter 1 2022 Cybersecurity Newsletter*, U.S. DEP'T HEALTH HUM.SERVS., (Mar. 17, 2022), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity-newsletter-first-quarter-2022/index.html.

collects, and Defendant is further required to maintain sufficient safeguards to protect that information from being accessed by unauthorized third parties.

81. Given the application of HIPAA to Arietis, and that Plaintiff and Class Members directly or indirectly entrusted their PHI to Defendant in order to receive healthcare services from Defendant's Customer-Healthcare Providers, Plaintiff and Class Members reasonably expected that Arietis would safeguard their highly sensitive information and keep their PHI confidential.

**E. FTC Guidelines Prohibit Arietis from Engaging in Unfair or Deceptive Acts or Practices.**

82. Arietis is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

83. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[39]

[39] *Start with Security – A Guide for Business*, United States Federal Trade Comm'n (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

84. The FTC provided cybersecurity guidelines for businesses, advising that businesses should protect personal customer information, properly dispose of personal information that is no longer needed, encrypt information stored on networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[40]

85. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[41]

86. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

[40] *Protecting Personal Information: A Guide for Business*, United States Federal Trade Comm'n, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[41] *Id.*

87. Arietis was at all times fully aware of its obligations to protect the PII and PHI of consumers because of its position as a business associate, which gave it direct access to reams of patient PII and PHI from its Customer-Healthcare Providers. Arietis was also aware of the significant repercussions that would result from its failure to do so.

88. Despite its obligations, Arietis failed to properly implement basic data security practices, and Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to member PII and PHI constitutes an unfair act of practice prohibited by Section 5 of the FTC Act.

**F. Plaintiff and Class Members Suffered Damages.**

89. For the reasons mentioned above, Arietis's conduct, which allowed the Data Breach to occur, caused Plaintiff and members of the Class significant injuries and harm in several ways. Plaintiff and members of the Class must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

90. Once PII and PHI is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or obtained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives as a result of Defendant's conduct. Further, the value of Plaintiff and Class Members' PII and PHI has been diminished by its exposure in the Data Breach.

91. As a result of Defendant's failures, Plaintiff and Class Members are at substantial increased risk of suffering identity theft and fraud or misuse of their PII and PHI.

92. From a study, 28% of consumers affected by a data breach become victims of identity fraud—this is a significant increase from a 2012 study that found only 9.5% of those affected by a breach would be subject to identity fraud. Without a data breach, the likelihood of identify fraud is only about 3%.[42]

93. With respect to healthcare breaches, another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[43]

---

[42] Stu Sjouwerman, *28 Percent of Data Breaches Lead to Fraud*, KnowBe4, https://blog.knowbe4.com/bid/252486/28-percent-of-data-breaches-lead-to-fraud (last visited Oct. 20, 2023).

[43] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, HealthITSecurity, https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud (last visited Oct. 20, 2023).

94. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[44]

95. The reality is that cybercriminals seek nefarious outcomes from a data breach and "stolen health data can be used to carry out a variety of crimes."[45]

96. Health information in particular is likely to be used in detrimental ways—by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[46]

97. "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[47]

98. Plaintiff and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and is subject to further attack so long as

---

[44] *Id.*
[45] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[46] *Id.*
[47] *The Potential Damages and Consequences of Medical Identity theft and Healthcare Data Breaches*, Experian, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited Oct. 20, 2023).

Defendant fails to undertake the necessary and appropriate security and training measures to protect the PII and PHI of its Customer-Healthcare Providers' patients.

99. Plaintiff and Class Members have suffered emotional distress as a result of the Data Breach, the increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers.

**G. Plaintiff's Experience**

100. Plaintiff is a Pennsylvania citizen who was a patient of NorthStar Anesthesia of Pennsylvania, LLC, a provider that uses Arietis's billing services. On or about September 29, 2023, Plaintiff received a letter from Arietis informing him that his PII and PHI in Defendant's possession had been compromised during the Data Breach.

101. Arietis uses the MOVEit technology to handle patients' sensitive information, including Plaintiff's PII and PHI. Plaintiff reasonably expected that his highly personal information would remain safeguarded and would not be accessible by unauthorized parties.

102. While Defendant has provided Plaintiff with an offer of credit monitoring, this offer is time-limited and will expire long before the threat to Plaintiff's PII and PHI. And any event, Arietis puts the onus on Plaintiff to protect

his PII and PHI suggesting that he review his account statements and credit reports closely.[48]

103. Plaintiff has suffered actual injury from having his PII and PHI exposed and/or stolen as a result of the Data Breach, including: (1) required mitigation efforts, including needing to monitor his financial and medical accounts to ensure his information is not used for identity theft and fraud; (b) damages to and diminution of the value of his PII and PHI, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; (c) loss of privacy; and (d) continuous imminent and impending injury raising from increased risk of financial, medical, and identity theft and fraud.

104. In addition, knowing that hackers accessed and likely exfiltrated his PII and PHI and this information is likely has been and will be used in the future for identity theft, fraud, and other nefarious purposes has caused Plaintiff to experience significant frustration, anxiety, worry, stress, and fear.

## CLASS ALLEGATIONS

105. Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following class:

---

[48] *Notice of Security Incident*, *supra* note 6.

> All individuals in the United States whose PII and/or PHI was compromised in the Arietis Health Data Breach announced on or about September 29, 2023 (the "Class").

106. Excluded from the Class is Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

107. This proposed class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the class definition in an amended pleading or when he moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

108. **Numerosity:** Plaintiff is informed and believes, and thereon alleges, that there are at minimum, hundreds of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Arietis's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes approximately 1.9 million individuals.

109. **Commonality:** This action involves questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether Arietis had a duty to protect the PII and PHI of Plaintiff and Class Members;

b. Whether Arietis was negligent in collecting and storing Plaintiff's and Class Members' PII and PHI, and breached its duties thereby;

c. Whether Plaintiff and Class Members are entitled to damages as a result of Arietis's wrongful conduct; and

d. Whether Plaintiff and Class Members are entitled to restitution as a result of Arietis's wrongful conduct.

110. **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and willful conduct. Arietis was the custodian of Plaintiff's and Class Members' PII and PHI, when their PII and PHI was obtained by an unauthorized third party.

111. **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class. Plaintiff will fairly, adequately, and vigorously represent and protect the interests of the members of the Class and has no interests antagonistic to the members of the Class. In addition, Plaintiff has retained counsel who are competent

and experienced in the prosecution of class action litigation. The claims of Plaintiff and the Class Members are substantially identical as explained above.

112. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

113. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Arietis's liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendant breached its duty to Plaintiff and Class Members, then Plaintiff and each Class member suffered damages by that conduct.

114. **Injunctive Relief:** Arietis has acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

115. **Ascertainability:** Members of the Class are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Arietis's books and records.

## FIRST CAUSE OF ACTION
## NEGLIGENCE
## (On behalf of Plaintiff and the Class)

116. Plaintiff restates and realleges paragraphs 1 through 111 above as if fully set forth herein.

117. Arietis owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII and PHI in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

118. Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

119. Arietis had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By receiving, maintaining, and handling PII and PHI that is routinely targeted by

criminals for unauthorized access, Arietis was obligated to act with reasonable care to protect against these foreseeable threats. Furthermore, Arietis knew or should have known that, if hackers accessed the sensitive data contained in its data systems, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of Defendant's unsecured, unreasonable data security measures.

120. Arietis's duty also arose from its position as a business associate. Arietis holds itself out as a trusted healthcare business associate, thereby assuming a duty to reasonably protect the information it obtains from its Customer-Healthcare Providers. Indeed, Arietis, which receives, maintains, and handles PII and PHI from its Customer-Healthcare providers, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

121. Additionally, Section 5 of the FTC Act required Defendant to take reasonable measures to protect Plaintiff's and the Class's sensitive data and is a further source of Defendant's duty to Plaintiff and the Class. Section 5 of the FTC Act prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendant of

failing to use reasonable measures to protect highly sensitive data. Therefore, Defendant was required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendant's duties to adequately protect sensitive information. By failing to implement reasonable data security measures, Defendant acted in violation of Section 5 of the FTC Act.

122. Similarly, HIPAA is a further source of Defendant's duty to Plaintiff and the Class, as HIPAA required Arietis to take reasonable measures to protect Plaintiff's and the Class's sensitive data. Indeed, HIPAA required Arietis to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et seq*. By failing to implement reasonable data security measures, Defendant acted in violation of HIPAA.

123. Arietis breached the duties owed to Plaintiff and Class Members and thus was negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiff at this time, on information and belief, Arietis breached its duties through some combination of the following errors

and omissions that allowed the data compromise to occur: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its clients; and (h) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII or PHI.

124. But for Arietis's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII and PHI would not have been compromised.

125. As a direct and proximate result of Arietis's negligence, Plaintiff and Class Members have suffered injuries, including:

a. Theft of their PII and/or PHI;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c. Costs associated with purchasing credit monitoring and identity theft protection services;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g. Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Arietis with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Arietis fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class members.

126. As a direct and proximate result of Arietis's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(On behalf of Plaintiff and the Class)**

127. Plaintiff restates and realleges paragraphs 1 through 111 above as if fully set forth herein.

128. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities, such as Arietis, for failing to use reasonable measures to protect

PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

129. Arietis violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and PHI and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII and PHI it obtained and stored and the foreseeable consequences of a data breach involving member PII and PHI obtained from its healthcare provider partners.

130. Plaintiff and members of the Class are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

131. The harm that has occurred as a result of Arietis's conduct is the type of harm that the FTC Act was intended to guard against.

132. Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se.*

133. Arietis is an entity covered under the HIPAA, which sets minimum federal standards for privacy and security of PHI.

134. Pursuant to HIPAA, 42 U.S.C. § 1302d, *et seq.*, and its implementing regulations, Arietis had a duty to implement and maintain reasonable and appropriate administrative, technical, and physical safeguards to protect Plaintiff's and the Class members' electronic PHI.

135. Specifically, HIPAA required Arietis to: (a) ensure the confidentiality, integrity, and availability of all electronic PHI it creates, receives, maintains, or transmits; (b) identify and protect against reasonably anticipated threats to the security or integrity of the electronic PHI; (c) protect against reasonably anticipated, impermissible uses, or disclosures of the PHI; and (d) ensure compliance by its workforce to satisfy HIPAA's security requirements. 45 C.F.R. § 164.102, *et. seq*.

136. HIPAA also requires Arietis to provide Plaintiff and the Class Members with notice of any breach of their individually identifiable PHI "without unreasonable delay and in no case later than 60 calendar days after discovery of the breach." 45 C.F.R. §§ 164.400-414.

137. Arietis violated HIPAA by actively disclosing Plaintiff's and the Class Members' electronic PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PHI; and by failing to provide Plaintiff and Class members with notification of the Data Breach within 60 days after its discovery.

138. Plaintiff and the Class Members are patients within the class of persons HIPAA was intended to protect, as they are members of Defendant's Customer-Healthcare Providers.

139. The harm that has occurred as a result of Arietis's conduct is the type of harm that HIPAA was intended to guard against.

140. Arietis's violation of HIPAA constitutes negligence *per se*.

141. As a direct and proximate result of Arietis's negligence, Plaintiff and Class Members have suffered injuries, including:

a. Theft of their PII and/or PHI;

b. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

c. Costs associated with purchasing credit monitoring and identity theft protection services;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach—including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII and/or PHI being placed in the hands of criminals;

g. Damages to and diminution in value of their PII and PHI entrusted, directly or indirectly, to Arietis with the mutual understanding that Defendant would safeguard Plaintiff's and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their PII and/or PHI, which remains in Defendant's possession and is subject to further breaches so long as Arietis fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of PII and PHI to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class members.

142. As a direct and proximate result of Arietis's negligence, Plaintiff and Class Members have been injured as described herein, and are entitled to damages,

including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**<u>THIRD CAUSE OF ACTION</u>**
**DECLARATORY JUDGMENT**
**(On behalf of Plaintiff and the Class)**

143. Plaintiff restates and realleges paragraphs 1 through 111 above as if fully set forth herein.

144. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statute and state common law as described in this Complaint.

145. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class Members' PII and PHI and whether Arietis is currently maintaining data security measures adequate to protect Plaintiff and Class Members from further data breaches that compromise their PII and PHI. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff and the Class continue to suffer injury as a result of the compromise of their PII and PHI and remain at imminent risk that further compromises of their PII and/or PHI will occur in the future.

146. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Arietis owes a legal duty to secure patient PII and PHI obtained from its Customer-Healthcare Providers and to timely notify such patients of a data breach under the common law, Section 5 of the FTC Act, and HIPAA;

b. Arietis breached and continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII and PHI; and

c. Arietis's breach of tis legal duty continues to cause harm to Plaintiff and the Class.

147. This Court also should issue corresponding prospective injunctive relief requiring Arietis to employ adequate security protocols consistent with law and industry standards to protect patients' (*i.e.*, Plaintiff's and the Class's) PII and PHI.

148. If an injunction is not issued, Plaintiff and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Arietis. If another breach of Defendant's data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while

warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

149. The hardship to Plaintiff and Class Members if an injunction is not issued exceeds the hardship to Arietis if an injunction is issued. Plaintiff and the Class will likely be subjected to substantial identity theft and other damages. On the other hand, the cost to Arietis of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

150. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Arietis, thus eliminating the additional injuries that would result to Plaintiff, Class Members, and consumers whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all other similarly situated, prays for relief as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative

of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

C. For damages in an amount to be determined by the trier of fact;

D. For an order of restitution and all other forms of equitable monetary relief;

E. Declaratory and injunctive relief as described herein;

F. Awarding Plaintiff's reasonable attorneys' fees, costs, and expenses;

G. Awarding pre- and post-judgment interest on any amounts awarded; and

H. Awarding such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated: October 25, 2023

Respectfully Submitted,

*<u>/s/ Nicholas A. Colella</u>*
Gary F. Lynch*
Nicholas A. Colella (FL Bar No. 1002941)
Patrick D. Donathen*
**LYNCH CARPENTER, LLP**
1133 Penn Ave., Fl. 5
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Facsimile: (412) 231-0246
gary@lcllp.com
nickc@lcllp.com

Brian C. Gudmundson
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
Facsimile: (612) 341-0844
brian.gudmundson@zimmreed.com